ESTATE OF DONALD M. HAYES, DECEASED, R. W. HAINES, EXECUTOR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Estate of Hayes v. Commissioner
Docket Nos. 8272-71, 8273-71
United States Tax Court
T.C. Memo 1973-236; 1973 Tax Ct. Memo LEXIS 48; 32 T.C.M. (CCH) 1102; T.C.M. (RIA) 73236; October 25, 1973, Filed *48 James T. Mohan, for the petitioners. John Turner, Don Bosse, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in the estate taxes of petitioners as follows: Petitioners
Deficiencies Estate of Donald M. Hayes
$ 73,577.98
Estate of Ruby Hayes
108,767.79
Total
$182,345.77
The sole issue to be decided is the fair market value of the common stock of DuQuoin Coca-Cola Bottling Company on 2 June 24, 1967. [2]
The address of both petitioners at the time they filed their petitions was DuQuoin, Illinois. Donald and Ruby Hayes were husband and wife and were killed simultaneously in an airplane crash on June 24, 1967. Estate tax returns in both estates were filed with the district director in Springfield, Illinois. At the date of their deaths, Donald owned 795 shares and *49 Ruby owned 135 shares of the common stock of DuQuoin Coca-Cola Bottling Company (hereinafter "DuQuoin" or "Company"). The Company on that date had issued and outstanding a total of 5,952 shares of common stock and no stock of any other class or series. DuQuoin was a family-operated and family-owned company. It had its main growth under William R. Hayes, father of decedent Donald Hayes. Donald's brother, E. J. Hayes, was president from 1952 until his death in 1964. Thereafter Donald became president. William R. Hayes II, Donald's nephew, became president in 1967 upon Donald's death. All of the stock of the Company is held by the Hayes family. 3 There have been no sales of the stock since 1961, when the Company acquired the last stock owned outside the Hayes family, a block of 300 shares acquired at $300 a share. Blocks of the Company's stock have been involved in two estate tax valuations within recent years. The stock of the estate of Ethel Hayes, who died on January 10, 1963 owning 728 shares, was reported on the estate tax return at $250 per share and settled with the Internal Revenue Service at $275 per share. The stock of the estate of E. J. Hayes, who died *50 on March 15, 1964 owning 547 shares, was reported on the estate tax return at $275 per share and settled with the Internal Revenue Service at $300 per share. The book value per share for the end of the calendar years 1962, 1963, 1966 and 1967 was as follows: Year End
Book Value Per Share 1962
$ 611.82
1963
634.28
1966
566.22
1967
528.63
While the issue to be decided is the value of Donald's and Ruby's common stock of DuQuoin (representing 13.4 percent and 2.3 percent, respectively, of the outstanding stock on June 24, 1967), both parties have approached the valuation problem through the valuation of the various assets of the Company at the date of death. There is no dispute over the value of certain of these assets, as follows: (a) farm land, $241,612; (b) a minority 4 interest in a dairy company at Harrisburg, Illinois (Dairy Brand), $180,481; (c) a 50 percent interest in a dairy business in Mayfield, Kentucky (Dairy Brand of Mayfield), $72,093; and (d) a 50 percent interest in a vending machine company (Cater-Vend), $203,130; or a total of $697,316. The asset values contested are (a) a soft drink bottling business, and (b) a fairground on which *51 an annual ten-day fair is conducted by the DuQuoin State Fair Association, plus an adjoining 35-acre tract. Soft Drink Bottling Business DuQuoin was founded in the 1870's as a small soda water bottling business. In 1913 it obtained a franchise to bottle and distribute Coca-Cola. Its franchise territory, located in central and southern Illinois, had a population of approximately 800,000, of which 200,000 are located in Springfield and Decatur and the remaining 600,000 are scattered throughout the territory. The Company experienced losses in the year of Donald's and Ruby's death (1967), and in six of the ten preceding years, in spite of generally increasing sales. A tabulation of sales by dollar volume and by case (unit sales), of operating profits or losses, of net earnings or losses, of dividends per share, of number of shares outstanding and of earnings and losses per share for 1957 through 1967 as follows: 5 1957
1958
1959
1960
1961
1962
Sales (nearest $
2,100,000
2,100,000
2,500,000
2,600,000
2,800,000
3,000,000
100,000)
Sales by cases
1,900,000
1,700,000
2,000,000
2,000,000
2,100,000
2,200,000
(nearest 100,000)
Operating profit
(141,724)
(123,113)
(79,276)
(47,535)
(20,365)
18,873
(loss)
Net earnings
(62,696)
(44,748)
(50,509)
(5,122)
14,410
65,070
(loss)
Dividends
NONE
NONE
NONE
NONE
10.00
10.00
Number of shares
7,138-1/2
7,138-1/2
7,138-1/2
6,553
6,253
6,253
Net earnings
(8.78)
(6.27)
(7.07)
(.78)
2.24
10.40
(loss) per share
*52 1963
1964
1965
1966
1967
Sales (nearest $
3,200,000
3,400,000
3,500,000
4,000,000
4,000,000
100,000)
Sales by cases
2,100,000
2,100,000
2,300,000
2,500,000
2,400,000
(nearest 100,000)
Operating profit
50,042
142,953
(173,755)
(362,241)
(257,535)
(loss)
Net earnings
92,728
136,638
(98,258)
(377,328)
(296,714)
(loss)
Dividends
15.00
10.00
5.00
5.00
NONE
Number of shares
6,253
6,253
6,253
6,253
5,952
Net earnings
14.83
21.85
(15.71)
60.61)
(49.85)
(loss) per share 6 For the calendar years 1962 through 1967 DuQuoin's cash position and net current assets declined, and the total debt of the Company nearly tripled. Petitioners' appraiser, James Reid, a senior appraiser of the financial evaluation division of the American Appraisal Company, primarily relied on capitalization of "debt-free cash flow" in valuing the bottling business. Reid noted that while the bottling business showed substantial net operating losses, it had a positive cash flow (by adding back depreciation and ignoring capital replacement needs). He used a number of publicly-owned bottling companies as comparatives, and compared their *53 cash flow to market values of their stock in order to develop a multiple. Before the multiple was determined or applied, interest expense was added back to income in order to establish "debt-free cash flow"; otherwise the differing debt structures from one company to another would distort the determination of operating results. From this comparison, he developed a multiple of seven to apply to the debt-free cash flow of DuQuoin. [3] Since the debt-free cash flow of DuQuoin was approximately $200,000 per year from the bottling business, this indicated a debt-free enterprise value for the bottling 7 business of $1,400,000. From this Reid subtracted the long-term debt of $560,000 to reach a fair market value of $840,000. Reid, in analyzing DuQuoin's costs in the bottling business and comparing them with the publicly-owned profitable bottling companies, found that DuQuoin's *54 cost of producing merchandise (i.e., direct labor and materials for production of the product) appeared normal. It was in its distribution and administration expenses that its costs were abnormally high, and this Reid attributed to the sparsely populated, widespread territory of the Company resulting in high distribution costs and high supervisory expenses in operating out of five different points necessitated by its widespread territory. Reid also noted that this was a family business and officers' salaries were higher than they would have been if the officers had not been family members. Reid did not consider book value of a company like this, which had been in operation for a long time, to be a reasonable measure of value. He considered that the income a business generates is the primary measure of its value. On the other hand, in the case of Cater-Vend, which had been recently formed and had an erractic earnings history, he relied on book value in making his appraisal. Moreover, in the case of Dairy Brand and Dairy Brand of Mayfield, which were not profitable operations, Reid used a liquidation value based on a portion of book value. Respondent's appraiser was Morris M. *55 Green, Jr., a financial 8 analyst with the Internal Revenue Service since 1966. Before joining the Internal Revenue Service Green had had a long and varied career doing appraisal work. Mr. Green based his appraisal of the Company's bottling business on a comparison of book value to market value of eight profitable publicly-owned bottling companies. [4] The stock of these companies sold from 158 percent to 1,010 percent of tangible book value. Green used 100 percent of the tangible book value (not including the Coca-Cola franchise) of the bottling business, or $2,365,085. He used book value instead of a multiple of earnings because the bottling business had had no earnings in the year of death or two previous years. Green also noted, as had Reid, that the Company paid unusually high salaries to its officers. In valuing Dairy Brand and Dairy Brand *56 of Harrisburg, both loss corporations, Green used 50 percent of book value. In valuing Cater-Vend, a profitable company, Green used a multiple of 15 times the average of the last two years' earnings. After Donald's death in June 1967, William R. Hayes II became president of the Company and took certain actions in an attempt to alleviate losses. He asked for and received the counsel of The Coca-Cola Company, and engaged a management firm 9 for the bottling business called Talbert & Associates from Atlanta. He consolidated all manufacturing at DuQuoin and went into long-haul transportation to distribution points. A computer service was engaged for cost control. The Company's bottling business had had an operating loss in 1966 of $362,241, and in the first six months of 1967 lost approximately $180,000. At the end of 1967, approximately six months after the death of Donald, the annual operating loss was $257,535, and by the end of 1968 the annual operating loss had been reduced to $66,339. William R. Hayes II decided in the latter part of 1968 that the Company's bottling business could not be made profitable even though the losses could be reduced. He had doubts about the *57 salability of the bottling business, but decided to explore the possibility. He found no prospects to purchase the Company in 1968 and found only one prospect, W. B. Terry, in 1969. W. B. Terry originally came from Vandalia in the heart of the Hayes' Coca-Cola territory. He had owned and sold Coca-Cola bottling businesses in San Jose, California; Pittsburg, Pennsylvania; and Terre Haute, Indiana. In 1969 he owned a Coca-Cola bottling business in Lexington, Kentucky. On June 9, 1969, two years after Donald's and Ruby's death, W. B. Terry purchased the DuQuoin bottling business 10 for $2,933,938. [5]
*58 After considering all the evidence and the opinions of the parties' expert witnesses, and using our best judgment, we find as a fact that the bottling business on June 24, 1967 had a fair market value of $1,200,000. Fairground and 35-Acre Tract The remaining DuQuoin assets to be valued are the fairground and an adjacent 35-acre tract. The annual DuQuoin Fair, which is held each year for a ten-day period beginning the last week in August, has always enjoyed large attendances. It features horse racing and entertainment by talented artists. In 1957 the Hambletonian, which is recognized as the outstanding harness race in the United States, moved to the DuQuoin fairground and has continued to be held there each year. Respondent offered the testimony of Kelly Martin, a real estate appraiser from Belleville, Illinois, on the value of the fairground and adjoining 35-acre tract immediately south of the fairground. 11 Martin noted that the population of the City of DuQuoin in 1970 was 6,691, and that it had grown only two percent in the preceding ten years. He pointed out that the nearest metropolitan area was St. Louis which is 85 miles away, and that there is no other *59 city within 100 miles of DuQuoin with a population of 50,000 or more. Martin did not use an income approach to valuation because income data were not available to him. Nor did he use a comparative sales approach because he could not find any reliable comparative race track sales and he knew of no fairground sales. Instead he valued the fairground improvements on the basis of replacement cost less depreciation based on age and functional and economic factors. As to the underlying land value apart from the improvements, he used the comparative sales approach. Only two new industries came to DuQuoin during the ten years preceding the valuation date. One was Phelps Dodge which came in 1964 and bought 80 acres of ground for $700 per acre (buying one 40-acre tract from the Company). This tract was located across the highway immediately west of the fairground property and had its long dimension on the highway. The other industry was Turco Manufacturing Company, to which the Company donated ten acres of land free of charge, and subsequently sold an adjoining 5-acre tract for $5,000. This land was located on the east side of the city limits, closer to the city than the fairground *60 property. In Martin's 12 opinion, in view of these comparative sales, (i) the fair market value of the entire 230 acres of fairground property apart from the buildings and other improvements was $1,000 per acre, or $230,000, and (ii) the fair market value of the 35-acre tract immediately south of the fairground was $1,200 per acre, or $42,000. The fairground improvements are attractive and well maintained. Most of them were built during the 1940's. In July 1967 the improvements included numerous horse stables, a rotunda barn (including a five-room apartment and the main fair offices plus adjoining wings with 150 stalls), a grandstand and exhibition hall, north and south grandstands (added in 1957 and consisting solely of metal bleachers with wood plank seats), restrooms, concession stands in the carnival area, horseshoer's building, a large livestock exhibition hall, paddock area with three horsestall barns, livestock and rodeo offices, three old barns, a race track, and paved streets and utilities. The rotunda barn burned down in 1970; the barn was insured for $90,000 which was received from the insurer. The main grandstand seats 8,296 people under a roof which extends *61 out over a large stage. The grandstand is equipped with restrooms, concession stands, first-aid rooms and a public address system. The main exhibition hall has three floors providing 28,576 square feet for displays. It also contains press facilities, a large entry-way, gates to the grandstand and ticket booths. Martin's opinion as to the 13 value of the fairground improvements was $1,008,700, in addition to the value of the land. Petitioners' expert, James Reid, valued the farms and fairground at their net book value of $600,000. Reid explained that the farms and fairground were loss or break-even operations and therefore earnings did not provide a reasonable basis for value. He noted that any alternate use of the fairground would render the existing improvements obsolete, but that the underlying land, if vacant and available for development to its highest and best use, would be worth substantially more than its book value. Petitioners' rebuttal expert on the land valuation was Paul Brown, a real estate broker from Carbondale, Illinois, 20 miles south of DuQuoin. In his opinion the only building on the fairground suitable for an alternate use was the exhibition hall, *62 and he stated it had a fair market value of $105,000. He testified that there were no alternate uses for the remaining fairground improvements and that, since they produced losses, in his opinion they had no fair market value. As to the underlying land in the fairground apart from the improvements, he testified that in his opinion the front sixty acres extending 3/8ths miles on the highway and 1/4th mile east and west (the same depth as the Phelps Dodge property) had a fair market value of $700 per acre, or $42,000, and the remainder of the fairground lying to the east had a fair market value of $220 14 per acre, or $37,000. The 35-acre tract south of the fairground, being farther from the city and with the middle part of its highway frontage missing, in his opinion had a fair market value of $450 per acre, or $15,750. He agreed that the Phelps Dodge sale and the sale to Turco were the only comparable sales. R. W. Haines, secretary and member of the board of directors of DuQuoin, prepared annual reports to the Illinois State Department of Agriculture covering the fairground operation. On the reports for 1964 through 1967, the Company reported the value of the fairground *63 and improvements as $1,500,000. Since the death of Donald and Ruby, the Company has tried without success to make the fairground profitable by going into other activities in addition to the fair. Prior to 1969, the Company kept a combined set of accounts for farms and fairground. From 1969 on, separate accounting was made for the farms and fairground. The following table shows rental income from the Fair Association, net income before depreciation, depreciation deduction and net income after depreciation for the use years 1962 through 1971: 15 Farms and Fairground
Rent from Fair
Net Income before
Depreciation
Net after
Assoc.
Deprec.
Deprec. 1962
40,000
(3,419)
47,640
(51,059)
1963
40,000
30,695
46,932
(16,237) 1964
40,000
11,017
46,584
(35,567)
1965
40,000
(4,886)
47,519
(52,405)
1966
40,000
14,615
50,014
(35,399)
1967
50,000
(12,165)
51,688
(63,853)
1968
50,000
(60,567)
44,332
(104,899)$0
5& Farms
Only
Net Income before
Depreciation
Net after
Deprec.
Deprec.
1969
23,044
10,737
12,307
1970
15,356
7,748
7,608
1971
9,004
12,063
(3,059)
$05&
Fairg
round
Only
Rent from Fair
Net Income before
Depreciation
Net after
Assoc.
Deprec.
Deprec.
1969
30,000
(34,937)
31,519
(66,456)
1970
-0-
(93,867)
18,741
(112,608)
1971
120,000
21,365
41,047
19,682
*64 After careful consideration of the entire record, recognizing that valuation is not an exact science, we have concluded and find as a fact that the fair market value of the fairground on June 24, 1967 was $900,000, and the fair market value of the adjoining 35-acre tract on June 24, 1967 was $1,000 an acre, or $35,000. 16 Value of DuQuoin Stock Both Reid and Green, after arriving at a valuation of the assets of the Company, allocated this value on a per share basis and then discounted the stock for lack of marketability. Reid used a 25 percent discount and Green used 20 percent. We find a 25 percent discount to be appropriate. The value of the assets of the Company, as we have found it, is as follows: Soft drink bottling business
$1,200,000
Stock in other corporations
455,704
Fairground
900,000
35-acres at $1,000 an acre
35,000
Other real property
241,612
Total
$2,832,316
Value per shares: $2,832,316/5,952 shares = $475.86 Discounted for lack of marketability by 25 percent: .75 X $475.86 = $356.89 per share. Decision will be entered under Rule 50. Footnotes
1. Consolidated herewith for trial, briefing and opinion is the case of the Estate of Ruby Hayes, Deceased, R. W. Haines and James E. Bennett, Executors, docket No. 8273-71. ↩
2. Petitioners have conceded the correctness of the other adjustments made in the statutory notices of deficiency. Respondent concedes that petitioners are entitled to additional attorneys' fees and appraisers' fees of $10,000 for each estate, to the extent those fees are actually incurred and paid. ↩
3. His comparative companies were Coca-Cola Bottling Co. of Los Angeles; Coca-Cola Bottling of New York, Inc.; 7-Up Bottling Co. of Los Angeles; Associated Coca-Cola Bottling Co. and Pepsi-Cola General Bottlers, Inc. These companies had cash flow multiples ranging from 5.4 to 11.5, with a median of 7.9. ↩
4. The companies used were Pepsi-Cola Bottling Co. of Washington, D.C.; American Beverage Corp.; Pepsi-Cola General Bottlers, Inc.; Associated Coca-Cola Bottling Co.; Coca-Cola Bottling Co. of New York, Inc.; Coca-Cola Bottling Co. of Los Angeles; Pepsi-Cola Bottling Co. of Long Island and Allegheny Pepsi-Cola Bottling Co. ↩
5. Petitioners argued that evidence of a sale two years after the date of death is inadmissible. The evidence is admissible and the circumstances surrounding the sale, including the date thereof, go to the weight to be given such evidence. As Justice Cardozo pointed out in , in considering the use made of a patent after the valuation date in issue: "Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." ↩